UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPORTS MARKETING MONTERREY GROUP LLC,<br><br>Plaintiff,<br><br>v.<br><br>SOCIOS SERVICES US INC., et al.,<br><br>Defendants. | Case No. 22-cv-08939-SI<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND RE: INITIAL CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. No. 12 |

**INTRODUCTION**

This is a trademark action concerning the marks "SocioMX" and "Socios.com."  The marks are used by two companies that provide "fan engagement" products and services for U.S. fans of professional soccer.  Since 2014, plaintiff Sports Marketing Monterrey Group LLC ("Monterrey Group") has offered a fan loyalty program for Hispanic soccer fans under the name "SOCIOMX" by organizing and selling tickets to matches and tours involving professional soccer teams in U.S. arenas, as well as by selling "VIP experiences" such as locker room tours, autograph signings and "meet and greet" events with soccer players.  Monterrey Group obtained federally registered trademarks for "SOCIOMX" and "SOCIO MX" in 2016, and has used those marks on its website, social media, advertising in soccer stadiums and arenas, and soccer-related merchandise.

Starting in Europe in 2018, Socios Services US Inc. and Mediarex Enterprise Limited ("Socios.com") began using "Socios.com" as a fan engagement platform to connect sports fans with their favorite teams, including European professional soccer teams.  In 2022, Socios.com announced partnerships with American Major League Soccer teams and sponsored matches and tours in some of the same arenas that had hosted SOCIOMX matches.  Defendants also offer a "Socios.com"

digital app, through which sports fans can set up accounts on their phones or other devices, connect with their favorite teams, and use "Fan Tokens" to play games and vote on polls.  By engaging in these activities, fans can earn rewards, such as tickets to games, "VIP experiences," "meet and greet" events with players, and signed merchandise.

This lawsuit, filed in  December, 2022, asserts infringement by defendant of Monterrey Group's intellectual property.  On February 10, 2023, the Court held a hearing on Monterrey Group's motion for a preliminary injunction.  For the reasons set forth in this order, the Court finds that Monterrey Group has demonstrated a likelihood of success on the merits of its trademark infringement claims, and that absent preliminary relief, it will be irreparably harmed due to the likelihood of consumer confusion, loss of goodwill, and loss of business opportunities.  The Court also finds that an injunction is in the public interest and that the balance of equities weighs in favor of Monterrey Group because, among other things, the injunction is narrowly tailored to only prohibit defendants' use of "socios.com" in the United States with regard to soccer, and does not affect Socios.com's partnerships with other types of U.S. sports teams.  Further, the Court is prepared to set an aggressive pretrial schedule and can hold a trial in this matter as early as late October/early November, thus minimizing any harm to defendants due to the granting of the injunction.  As discussed in the Conclusion of this Order, the parties are directed to meet and confer to select a new date for the initial case management conference that accommodates defense counsel's trial schedule, and to notify the Court's clerk as soon as possible of the new date.

**BACKGROUND**

**I.    SOCIOMX**

Jorge Villalobos is the co-founder and CEO of plaintiff Sports Marketing Monterrey Group LLC ("Monterrey Group" or "SocioMX").  Villalobos Decl. ¶ 1 (Dkt. No. 12-1).[1]  In 2001,

---

[1]  Messrs. Villalobos and Dreyfus have filed multiple declarations in connection with the pending motion and other motions related to discovery and timing of the preliminary injunction briefing and hearing.  When the declarations were filed in connection with the other motions, they are identified by filing date.  Mr. Villalobos's declaration that he filed in connection with the motion is "Villalobos Decl." and the reply declaration is "Reply Decl."

United States District Court
Northern District of California

Villalobos and his brother founded Monterrey Group in Monterrey, Mexico as "a sports agency that represents and develops professional and commercial opportunities for elite athletes and teams." *Id.* ¶ 3. In 2007, Villalobos immigrated to Dallas, Texas, and he opened a subsidiary office of Monterrey Group in Dallas in 2008. *Id.* Villalobos states,

> 4. In the United States, I saw a desire among other Mexican-Americans to connect with their favorite soccer teams from Mexico, but there were very few opportunities for fans in the United States to interact with these teams or watch them play in person. I understood that soccer is a social movement for over 80 million members of the Hispanic and multicultural community that extended beyond watching games on television.
>
> 5. As a soccer fan myself, I was inspired to try to meet this demand. In 2014, I created the SocioMX fan loyalty and engagement platform. SocioMX organizes events and fan engagement opportunities, both in-person and on social media. SocioMX also organizes or promotes "friendly" exhibition matches between professional soccer teams from soccer leagues in the United States, Italy, and Mexico.
>
> 6. We generate our revenue by selling tickets to these games and experiences as well as through memberships and merchandising. Sponsors and brand partners also pay for the opportunity to advertise to our fans through our virtual and in-person programs.
>
> 7. I chose the SocioMX name because "Socio" means "partner" in Spanish, and I want the fans who attend or connect to any game, event or activity promoted under the SocioMX name—or see SOCIOMX-branded content on television, social media, or online—to feel like "partners" of the participating soccer teams. Throughout our social media communications with our fans, we refer to them as our "Socios" . . . The "MX" suffix was added to represent Mexico, where the teams I initially partnered with were based.

*Id.* ¶¶ 4-7.

Monterrey Group owns two United States trademark registrations for the SocioMX brand: "SOCIO MX" (Reg. No. 4,948,066, registered Apr. 26, 2016) and "SOCIOMX" (Reg. No. 5,055,024, registered Oct. 4, 2016) (the "SOCIOMX marks").[2] Villalobos Decl. Ex. B-C (Dkt. Nos. 12-3, 12-4). The SOCIOMX marks are both standard character word marks without claim to any particular font style, size, or color,[3] and both registrations state that "The English translation of the

---

[2] These registrations initially were applied for in the name of SM Monterrey Group, LLC. The company changed its name with the Texas Secretary of State on March 20, 2022 to Sports Marketing Monterrey Group LLC. *Id.* ¶ 8 n.1.

[3] "Standard character registrations 'are federal mark registrations that make no claim to any particular font style, color or style of display." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014) (quoting *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1349

word 'SOCIO' in the mark is 'partner.'" *Id*.  The '066 mark covers:

> FOR: ADVERTISING AND PUBLICITY; BUSINESS MANAGEMENT, BUSINESS ADMINISTRATION; TELEVISION AND RADIO ADVERTISING, DIRECT MAIL ADVERTISING, MARKETING RESEARCH, PUBLIC RELATIONS, INTERNET ADVERTISING, ADVERTISING BY MAIL ORDER, RETAIL SALE PROMOTIONS BY WAY OF COMMUNICATION MEDIA; MARKETING THE GOODS AND SERVICES OF OTHERS BY FEATURING SPORTS MERCHANDISING AND SERVICE ADS; PROMOTING AND MARKETING OF THE BRANDS, PRODUCTS, SERVICES AND ONLINE WEBSITES OF INDIVIDUALS, BUSINESSES AND NONPROFIT ORGANIZATIONS; PROVIDING ADVERTISING, MARKETING AND PROMOTIONAL SERVICES, NAMELY, DEVELOPMENT OF ADVERTISING CAMPAIGNS PROVIDED THROUGH CABLE TELEVISION BROADCAST, WEB CASTS, RADIO BROADCASTS, NEWSPAPERS, MAGAZINES, ONLINE BANNERS, OUTDOOR BILLBOARDS, WILD POSTINGS, BUS AND SUBWAY ADS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

> FIRST USE 1-20-2015; IN COMMERCE 1-20-2015.

> FOR: EDUCATION, NAMELY PHYSICAL EDUCATION; TRAINING, NAMELY, ATHLETIC TRAINING AND DEMONSTRATIONS; ENTERTAINMENT, NAMELY, RADIO ENTERTAINMENT AND TELEVISION ENTERTAINMENT IN THE NATURE OF SOCCER GAMES, TOURNAMENTS AND COMPETITIONS; ORGANIZATION OF SPORTS COMPETITIONS; CULTURAL AND SPORTING ACTIVITIES RELATED TO SOCCER EVENTS AND COMPETITIONS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

> FIRST USE 1-20-2015; IN COMMERCE 1-20-2015

Villalobos Ex. B.

The '024 mark covers the following classes:

> CLASS 16: Paper, cardboard, and wrapping paper, paper napkins, paper gift cards, paper decorations; printed matter, namely, magazines in the field of sports, namely, soccer, printed paper signs featuring sports, namely, soccer, souvenir programs concerning sports, namely, soccer, event programs, trading cards, newsletters related to soccer, bumper stickers, game cards, posters, picture cards, paper pennants, printed tickets for sports games and events; pens, ink pens, gel pens, marking pens, felt tip pens, drawing pens; pictorial prints, picture cards, posters; sports collectible cards; photographs; stationery; artists' materials, namely, writing brushes, paintings, pictures, drawing pens; typewriters and office requisites except furniture; training equipment except apparatus, namely, notebooks, notepad, plastic packaging material; printers' type; printing cliches

> FIRST USE 4-7-2016; IN COMMERCE 4-7-2016

---

(Fed. Cir. 2011)).  "Because a word registered in standard characters is 'not limited to any particular rendition of the mark,' the registration covers the word per se."  *Pom Wonderful*, 775 F.3d at 1125 (internal citations omitted).  The exclusive right to use a standard character mark "is extremely broad, covering the word in all types of depictions."  *Id*.

United States District Court
Northern District of California

CLASS 21: Cups and mugs

FIRST USE 4-22-2016; IN COMMERCE 4-22-2016

CLASS 25: Clothing, namely, shirts, shorts, hosiery, pants, jerseys; athletic apparel, namely, shirts, pants, jackets, footwear, hats and caps, athletic uniforms; athletic footwear for sports, namely, soccer, flip flops, graphic T-shirts, hooded sweat shirts, sweat shirts, moisture-wicking sports pants, moisture-wicking sports shorts; headgear, namely, cap peaks, head wraps, headbands, hats and caps, socks

FIRST USE 4-5-2016; IN COMMERCE 4-5-2016

CLASS 28: Games and toys, namely, sports balls, balls for games, board games, playing cards, stuffed toys; bags specially adapted for sports equipment, trolley bags specially adapted for soccer equipment; soccer balls, sport balls; sports field equipment, namely, corner flags and goals for soccer; sporting articles, namely, shin guards, soccer balls, knee guards, soccer goals, soccer goal nets and soccer corner flags

FIRST USE 4-20-2016; IN COMMERCE 4-20-2016

CLASS 38: Telecommunications, namely, providing access to a global computer network; news agencies, namely, the transmission of news items to news reporting organizations; communications by computer terminal; computer aided transmission of messages and images, communications by fiber optic networks; radio broadcasting, telephone communications, television broadcasting, cellular telephone communication; providing internet communication portals, namely, internet chatrooms

FIRST USE 2-17-2016; IN COMMERCE 2-17-2016

*Id.* Ex. C.

In recent years, Monterrey Group has also used the SOCIOMX marks in connection with a design that features a shield with a gold soccer ball surrounded by wings of laurel leaves in representation of victory. *See id.* ¶ 9. The SOCIOMX design has appeared on promotional items such as hats and soccer balls. *Id.* ¶ 10.

To date, Monterrey Group has organized 34 "friendly" SOCIOMX soccer games with professional teams from the United States, Mexico and Italy. *Id.* ¶ 11. Monterrey Group organizes every aspect of the game, including inviting the teams, arranging travel, finding sponsors, securing the venue, and promotion of the event. *Id.* Monterrey Group organized its first SOCIOMX-branded soccer games in July 2014, which it collectively called the "SocioMX Tour." *Id.* ¶ 12. The 2014 Tour consisted of five soccer matches, each in different United States cities (Dallas, Chicago, San Antonio, San Diego, and Los Angeles), and included teams from the top professional league in Mexico, "Liga MX"—Cruz Azul, Club Monterrey, Pumas, Chivas, Tijuana (Xolos)— as well as

one team from the North American Soccer League (a former American division II professional soccer league)— the San Antonio Scorpions.  *Id*.  Monterrey Group partnered with Coors Light to present the SocioMX Tour, and the games were broadcast in the United States via Estrella TV and Univision and in Mexico and Latin America via ESPN.  *Id.* ¶¶ 12, 19.

Since 2014, the SocioMX tour has been an annual event that consists of multiple games mostly in Texas and California, which are two of the largest soccer markets in the country.  *Id*. ¶ 13.[4] Since 2017, the tour has included Major League Soccer ("MLS") teams, such as the Houston Dynamo and the San Jose Earthquakes, and United Soccer League team Austin Bold.  *Id*.  Monterrey Group organizes matches and events in addition to the SocioMX tour.  *Id.* ¶ 14.  Those matches and events have historically been in California and Texas, and Villalobos states that "[m]ore recently, SocioMX has been working to develop partnerships with MLS teams in other states because a growing population of fans of MLS teams now live in other states."  *Id*.   Attendance at SocioMX matches has generally ranged from 3,500 to over 20,000 fans per game, with attendance reaching 34,000 at a game at Soldier Field in Chicago and 42,000 at a match at the LA Coliseum in Los Angeles.  *Id*. ¶ 15.  Villalobos states that in total, approximately 500,000 fans have attended SocioMX matches over the years.  *Id*.

The SOCIOMX matches frequently occur at venues used by professional soccer teams, such as Soldier Field (Chicago Fire FC), Toyota Field (San Antonio FC), Dignity Health Sports Park (LA Galaxy), Bonney Field (Sacramento Republic FC), PNC Stadium (Houston Dynamo FC), Bold Stadium (Austin Bold FC), and PayPal Park (San Jose Earthquakes).  *Id.* ¶ 16.  The SOCIOMX marks are prominently displayed in on-field signage, video screens, and in other branding at the stadiums during the matches.  *Id.* ¶ 17.  SOCIOMX soccer matches typically are accompanied by other SOCIOMX-branded events and "fan engagement opportunities," such as locker room tours, the chance to conduct the coin toss, and early access to watch players warm up.  *Id.* ¶ 18.  During these events, SocioMX also distributes merchandise with the SOCIOMX mark, such as apparel, soccer balls, and posters.  *Id*.

---

[4] The tour did not occur in 2020 due to the COVID-19 pandemic.  *Id*.

From 2014 to 2017, SocioMX engaged more in traditional advertising for its SOCIOMX games and events, including radio and TV advertisements, billboards, street boards, print collateral, flyers, posters, and some social media advertising.  *Id.* ¶ 22.  Villalobos states, "[t]oday, we rely more on digital and experiential advertising efforts, such as announcing matches and developing original content on SocioMX's SocioTV channel, hosting events to build interest in the match, updating its website (https://socio.mx/), which is still under renovation,[5] and investing heavily into social media advertising on the SocioMX Twitter, Facebook, and Instagram accounts."  *Id.*  SocioMX creates graphics that display the SOCIOMX Mark for these campaigns that sponsoring partners (such as national brands like MoneyGram, Coors Light, and Pepsi) and teams use to promote the matches in addition to their own advertising.  *Id.* These companies typically pay SocioMX for the right to use the SOCIOMX Mark in connection with their products or services.  *Id.*

SOCIOMX-branded soccer matches can be viewed on Roku, as well as on the SocioTV website (https://sociotvplus.com/).  *Id.* ¶ 27.  SocioMX has also developed a Spanish-language sports talk show, "En La Cancha" ("On The Field"), "hosted by prominent figures in the Mexican sports community, including a former World Cup player and a major Mexican sports commentator."  *Id.* ¶ 28.  To date, SocioMX has produced hundreds of "En La Cancha" segments on SocioTV and Roku.  *Id.*  "En La Cancha" most recently offered coverage, commentary, and original content about the World Cup events in Qatar.  *Id.* ¶ 29.  This programming generated over $100,000 in media sales from companies and brands looking to advertise on the channel.  *Id.*

Prior to the COVID-19 pandemic, SocioMX generated most of its revenue from sponsorship agreements and selling tickets to its games, which typically cost around $50 per ticket.  *Id.* ¶ 30.  Villalobos states that "SocioMX is about to launch the SocioTV app channel to AppleTV and Amazon FireTV, where it hopes the broadcasts will drive increases in revenue and engagement with the brand."  *Id.*

In 2021, SocioMX also relaunched its VIP experience program, "SOCIOMX GOLD."  *Id.* ¶ 31.  For an annual fee, consumers who sign up can receive exclusive rewards, such as live event

---

[5]  SocioMX launched its updated website on February 24, 2023.  Dkt. No. 69.

ticket presales, free tickets for games and events, exclusive raffles, access to private trainings, meet and greet options, welcome autographed jersey, and exclusive merchandise. *Id*. SocioMX has sold around 7,000 VIP packages to date. *Id*.

Villalobos states that "SocioMX has also been in talks to host games or other activations with teams and fans outside of our traditional markets in California and Texas." *Id*. ¶ 32. In August 2022, SocioMX hosted its first SocioMX game with a European team–Inter Milan's women's team. *Id*. SocioMX plans to bring more European teams to play games and participate in other marketing activities and digital activations in the United States, and to host events or matches in Washington D.C., Seattle, Kansas City, Columbus, Cincinnati, Miami, Orlando, and Atlanta. *Id*.

According to Villalobos, "SocioMX has also been in talks to partner with National Football League teams for marketing promotions, developing new markets and opportunities, including but not limited to digital, fan events and sponsorship sales." *Id*. ¶ 33.

Villalobos states that after Socios.com announced its partnership with Major League Soccer in May 2022 and its July 2022 co-sponsorship of the "Champions Tour" featuring professional soccer teams, he was contacted by several people who mistakenly believed that SocioMX was involved in the Socios.com soccer partnership and sponsorship. Villalobos states that in August 2022, his contact at PepsiCo emailed him to ask whether a Socios.com event was covered by the SocioMX-PepsiCo marketing agreement, expressing the belief that SocioMX had booked the soccer team FC Barcelona. *Id*. ¶ 34 (screenshot of email). Also in August 2022, a SocioMX contact at Capital One's offices in Dallas emailed Villalobos stating that they were unaware SocioMX had begun sponsoring soccer matches among European teams under the SOCIOMX marks, and that they were hoping to be able to work with SocioMX on these matches in the future. *Id*. ¶ 35. In September 2022, the president of a prominent soccer team in Mexico who had worked with SocioMX emailed Villalobos to request invitations to future matches with European soccer teams, seemingly confusing SocioMX's games with a tournament hosted by Socios.com that also featured teams from Europe. *Id*. ¶ 35. Villalobos also states that the head of a Mexican soccer team told him in a phone conversation that the team could no longer work with SocioMX because it was now being sponsored by Socios.com, and that another president of an MLS team "expressed reservations about working

8

with SocioMX following Socios' United States expansion, and has now refused for months to engage with SocioMX." *Id.* ¶¶ 40, 42.[6]

Villalobos states that aside from these instances of actual confusion, he does not want SocioMX to be associated with Socios.com because of Socios.com's cryptocurrency business model. Villalobos cites news articles reporting on criticism about Socios.com and the use of Fan Tokens (which are either purchased with Socios.com's cryptocurrency or provided free), including criticism that the risk disclosures about cryptocurrency are inadequate, as well as fan complaints about the "monetization" of fan engagement. *Id.* ¶¶ 43-45 & Ex. G (Chris Vallance, <u>Arsenal Fan Token Posts Broke Advertising Rules, Says Watchdog</u>, BBC, Dec. 22, 2021); Ex. H (Joey D'Urso, <u>Special Investigation: Socios 'Fan Tokens' – What They Really Are and How They Work</u>, The Athletic, Aug. 18, 2021).

## II.     Socios.com

Socios.com was founded in June 2018 by Alexandre Dreyfus. Dreyfus Decl. ¶ 3. (Dkt. No.

---

[6] SocioMX's reply papers include declarations from three of the contacts mentioned in Mr. Villalobos's opening declaration. *See* Declarations of Iris Lopez (Dkt. No. 55-18); Duilio Davino Rodriguez (Dkt. No. 55-19); Victor Jaramillo (Dkt. No. 55-20). These individuals provide somewhat more detail about the Socios.com advertising that they saw and their mistaken belief that the advertising was that of SocioMX, as well as their opinions that fans will be confused. *See id.* The Court discusses this evidence *infra* in the context of actual confusion.

Defendants object to these declarations, as well as portions of Mr. Villalobos's reply declaration and other reply evidence, on the grounds that this "new" evidence could and should have been included with the opening papers, and that Socios.com sought expedited discovery on these issues, which the Court partially denied. The Court overrules these objections. As an initial matter, the Court notes the procedural posture of this case – a motion for preliminary injunction where typically no discovery has been conducted. In addition, as the docket reflects, SocioMX voluntarily produced a considerable amount of discovery to defendants prior to the filing of the opposition brief. Further, the material at issue "responds to [the] opposition and is consistent with the argument and evidence presented in the moving papers." *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018). The Lopez, Rodriguez and Jaramillo declarations are consistent with Villalobos's opening declaration. Defendants object to Mr. Villalobos's reply statements about SocioMX's target consumers and the importance of Hispanic fans to soccer. However, in his opening declaration Mr. Villalobos stated that he founded SocioMX because he "saw a desire among other Mexican-Americans to connect with their favorite soccer teams from Mexico" and "understood that soccer is a social movement for over 80 million members of the Hispanic and multicultural community." Villalobos Opening Decl. ¶ 4. He also discussed his plans to expand SocioMX to bring more European teams to play in the United States and to expand into other geographical market, *id.* ¶ 32, and plaintiff's opening expert declaration discussed the target market as including non-Hispanic consumers. Butler Opening Decl. ¶¶ 19, 23.

United States District Court
Northern District of California

44).  Dreyfus is the founder and CEO of defendant Mediarex Enterprises Ltd., a company that "ultimately owns a family of subsidiaries around the world, including [defendant] Socios Services U.S. Inc., (collectively, the 'Socios.com Group'), which operates and promotes the Socios.com business." *Id*. ¶ 1.  Dreyfus states,

> 2.  The Socios.com business is a technology company offering a digital app for fan engagement that enables the world's most prominent sporting properties to plug into a unique fan influence and reward system, wherever fans are around the world.  The goal of Socios.com is to transition passive fans into active fans, which Socios.com views as essential to the future of sports.  Its vision is for an extensive network of the world's leading sporting organizations to achieve this through Fan Tokens and transactional fan engagement on the Socios.com app.  Fan Tokens, a concept that Socios.com pioneered, are digital assets.  They are minted on the Chiliz blockchain, and whereas we have launched Fan Tokens with our non-U.S. partners and these are available for purchase by our global users, including U.S. users, we are gradually launching dedicated Fan Tokens for our U.S. partners.  So far, more than 2 million Fan Tokens have been sold for U.S. partners.  For those U.S. partners that do not yet have Fan Tokens, the U.S. fan experience currently is focused on in-app digital tokens, known as "SSU Tokens," which are acquired through participating in polls, voting, and games, such as trivia contests.
>
> . . .
>
> 4.  I was originally inspired by the "socios" or fan-controlled management frameworks of many soccer teams around the world.  Perhaps the best known examples are Real Madrid and FC Barcelona, which are run by their fan bases of tens of thousands, but other clubs have even larger fan management, such as FC Bayern Munich, Portugal's SL Benfica, and Sporting CP, which have upwards of 150,000 each engaged in this type of democratic/mutual management system.  In this "socios" club structure, the fan-owners are more than just fans; they actually participate with voting rights in club management.  The tried and tested "socios" concept has created powerful relationships between teams and their fans for decades.  Socios.com represents the digitization of voting rights, through the so-called Fan Tokens we issue for our partners, to reflect the traditional 'socios' partner model between fans and the soccer clubs they are members of.  The main utility attached to a Fan Token is the right to vote on dedicated survey polls launched by the partners on the Socios.com platform, which allows fans to vote and make their voice heard and brings the fans closer to the teams they support.  This framework allows Fan Token holders to be more involved than an ordinary fan, and it is part of our effort to encourage sports teams to embrace new technology and fintech innovation.  Socios.com's fully digital solution means fans will no longer be restricted by geography, as the Socios.com app has the ability to connect fans worldwide to thousands of professional teams in existence.
>
> 5.  The ".com" portion of the Socios.com name reflects the digital platform nature of the experience—as distinct from the local, in-person concept historically associated with European soccer "socios."  I was not aware of Plaintiff's marks when selecting the name "Socios.com" in 2018—or when launching the www.socios.com website or the Socios.com app.  It has never been my intent to cause confusion with any other company's name.  Socios.com is the company's brand—not Socios US or Socios USA.

*Id*. ¶¶ 2, 4-5.

Socios.com initially partnered with European sports teams.  In 2018, Socios.com announced partnerships with two "renowned" European soccer teams, France's Paris Saint-Germain and Italy's Juventus.  *Id.* ¶ 6.  Socios.com's network continued to expand, growing to include partnerships with Spain's Atletico de Madrid in 2019 and FC Barcelona in 2020.  *Id.*  Globally, Socios.com now has more than 180 partners in many sports, including football, basketball, racing (Formula 1 and NASCAR), tennis, cricket, rugby, ice hockey, mixed-martial arts, and esports.  *Id.* ¶ 7.  Socios.com first partnered with soccer teams in Mexico's LigaMX in November 2021.  *Id.* ¶ 8.  In November and December 2021, two of these teams, Atlas FC and Santos Laguna, posted on their social media about their partnerships with Socios.com.  *Id.*  Socios.com has also partnered with Liga MX teams Tigres, Chivas, and Club América.  *Id.*

On May 3, 2021, defendant Mediarex Entertainment Limited applied for trademarks for "Socios.com."  Rennich Reply Decl., Ex. A-B.  Those applications state that the earliest use of "Socios.com" in the United States was "at least as early as" November 1, 2019.  *Id.*  The applications are pending.[7]

In July 2021, Socios.com was announced as soccer team Inter Milan's new Global Main Jersey Partner.  *Id.* ¶ 9.  The sponsorship cost approximately 16 million Euros, and under the sponsorship, Socios.com and its associated Fan Tokens for Inter Milan were the main sponsor on the front of Inter Milan's jersey for the 2021-2022 Serie A (top Italian league) season.  *Id.*  In early 2022, the Union of European Football Associations (UEFA) announced its partnership with Socios.com for the 2021-2024 cycle of the EUFA Champions League and the EUFA Super Cup.  *Id.* ¶ 11.  Dreyfus states that the EUFA Champions League involves the top soccer teams in Europe and is among the most significant soccer tournaments in the world.  *Id.*  In March 2022, Socios.com signed international soccer legend Lionel Messi, who led Argentina to its third World Cup victory in 2022, as Socios.com's first global ambassador.  *Id.* ¶ 12.

---

[7] At the February 10, 2023 hearing, defense counsel stated that the U.S. Patent & Trademark Office had requested that defendants disclaim "Socios.com" as descriptive, and that on February 9 defendants filed its submission with a disclaimer.

United States District Court
Northern District of California

Socios.com's first U.S. partnership occurred in May 2020 with the mixed-martial arts (MMA) league Ultimate Fighting Championship. *Id.* ¶ 15. Later in 2020, Socios.com partnered with another U.S.-based MMA league, the Professional Fighters League. *Id.* In 2021, the Socios.com network expanded to include major professional U.S. sports teams, beginning with the New Jersey Devils, a National Hockey League (NHL) team, in April 2021, as well as NASCAR racing team Roush Fenway Keselowski, in May 2021. *Id.* ¶ 19. By the end of 2021, 25 teams in the National Basketball Association (NBA) (including the Golden State Warriors, Los Angeles Lakers, San Antonio Spurs, and Houston Rockets), 14 teams in the NHL, one team in the National Football League (NFL), and one team in Major League Soccer (MLS) had announced partnerships with Socios.com. Jan. 5, 2023 Dreyfus Decl. ¶ 11 (Dkt. No. 30-1). In the first half of 2022, Socios.com entered partnerships with the MLS organization, 22 additional MLS teams, 13 more NFL teams, and 2 more NBA teams. *Id.* ¶ 13. Socios.com's advertising appeared in the stadiums and arenas of Socios.com's MLS partners throughout the end of the 2022 season, including during the MLS championship game on November 5, 2023. Dreyfus Opp'n Decl. ¶ 20. In July 2022, Socios.com was an official partner of the 2022 Soccer Champions Tour. *Id.* ¶ 24. Socios.com did not organize the tour and did not generate revenue from it, and was involved because of its relationships to the soccer teams that chose to participate in the tour. *Id.* ¶ 24. Socios.com does not intend to be an official partner of the 2023 Soccer Champions Tour, and "for business reasons unrelated to this lawsuit, the company does not plan to have Socios.com branding appearing in in-stadium advertising for the MLS games for the upcoming season." *Id.* ¶¶ 20, 24. As of January 5, 2023, "no announcements of new Socios.com partnerships with any U.S. soccer teams are planned for the next three months." Jan. 5, 2023 Dreyfus Decl. ¶ 14.

Currently, more than 80 professional teams and organizations in the U.S. have partnered with Socios.com. *Id.* ¶ 14. Socios.com has spent around $68 million in promoting Socios.com in the United States, approximately $8.5 million of which was spent on MLS before December 21, 2022. Dreyfus Opp'n Decl. ¶ 22.

All of the revenue for Socios.com comes through its digital app. *Id.* ¶ 29. Dreyfus states,

United States District Court
Northern District of California

> Our product is marketed to technology-savvy sports fans who want to participate in team decision making. Like many corporate sponsors, we pay teams for promotion and marketing rights; our partners do not pay us. Socios.com's partner marketing rights include physical marketing assets in-stadia, digital marketing assets in-app and on social channels, and for select partners, selling digital Fan Token assets and providing utility behind them. We use those marketing rights to promote the Fan Tokens and reward fans for their engagement levels. For example, we can award Fan Token holders who have purchased Fan Tokens or are actively engaging on our app with rewards for their loyal engagement with Socios.com.

*Id.*

Defendants do not organize or "host" matches of professional soccer teams, self-name tournaments involving professional soccer teams, sell tickets to games, sell VIP packages, or broadcast games using the Socios.com brand (or any other name). *Id.* ¶ 30. However, Socios.com users can be eligible to win prizes as a result of their engagement on the app, such seat upgrades and meeting players. *Id.*

Dreyfus states that Socios.com does not restrict its partners from collaborating with anyone else. *Id*. ¶ 31; *id*. Ex. J (letter to Dreyfus from the company that owns Inter Milan, a Socios.com soccer partner in Italy, which states that, while in partnership with Socios.com, it also worked with SocioMX to organize an exhibition game in the United States). Dreyfus also states,

> I have heard from my team who speak with our Liga MX partners that they are not interested in working with Mr. Villalobos for other reasons, including a lack of need for the services he provides. It is possible that they may not be interested in working with Mr. Villalobos because it was recently announced that the 2023 Leagues Cup, a soccer tournament involving the MLS and Liga MX, will be held in the summer and will involve every team from both leagues (more than 45 teams). Each of the two previous iterations of the Leagues Cup was more limited, involving only eight teams.

*Id.*

III.    **SocioMX's Awareness of Socios.com and Settlement Efforts**

Villalobos states that he first became aware of Socios.com in December 2021 or January 2022 when he was in Europe and watching a soccer game on television and saw Socios.com advertising. Jan. 11, 2023 Villalobos Decl. ¶ 10. Villalobos states, "[a]lthough I was surprised to see a brand name similar to SocioMX in connection with a soccer match, I was not particularly concerned at this time because my company, SocioMX, does not operate in Europe, where I saw this advertising. *Id.*

Several months later, in approximately March 2022, Villalobos saw Socios.com being advertised during the broadcast of a European soccer game in the United States. *Id.* ¶ 11. Villalobos continued to see similar advertising into April 2022, and he became concerned because the ads were targeted to people in the United States. *Id.* ¶ 12. Villalobos went to the Socios.com website and saw that it said "USA coming soon." *Id.*; *see also* Reply Villalobos Decl. Ex. J (Apr. 5, 2022 screenshot from app store with message stating "A new socios.com app coming soon to the . . . We have turned off select features for US users temporarily while we work to launch a more tailored US-facing Socios.com experience") (ellipses in original). Villalobos then retained legal counsel in Mexico, and in April 2022, SocioMX's lawyers sent letters to Instagram, Facebook, and YouTube on behalf of SocioMX requesting that the social media platforms remove Socios.com's allegedly infringing content. Jan. 11, 2023 Villalobos Decl. ¶ 13. Those efforts were unsuccessful. *Id.*

In May 2022, Villalobos learned that Socios had entered into a partnership with MLS. *Id.* ¶ 14. Villalobos began to see Socios.com advertised on social media in connection with MLS teams as well during broadcasts of MLS soccer games in the United States. *Id.* He states that he "was concerned by this development because SocioMX partners with the very same MLS teams," and he decided to retain counsel in the United States to help him take legal action against Socios.com. *Id.*

On July 7, 2022, SocioMX's former-United States counsel sent a cease-and-desist letter demanding that Socios.com stop using its marks in the United States. *Id.* ¶ 16. Socios responded in a letter dated July 15, 2022, in which it requested additional information about SocioMX's business. *Id.* Villalobos states that he started gathering information in response to that letter and reviewed a draft one week later. Reply Villalobos Decl. ¶ 50. In the meantime, Villalobos was informed through his Mexican counsel that a Socios.com representative was trying to reach him, and on August 17, 2022, Villalobos received an email from Max Rabinovitch, who Villalobos understood to be President of Socios Services U.S. Inc. *Id.* Villalobos and Rabinovitch spoke on August 18, and in that call Villalobos learned that Dreyfus, not Rabinovitch, was the ultimate decisionmaker for defendants. *Id.* ¶ 52. Over the next several weeks, Villalobos, Dreyfus and Rabinovitch emailed to schedule a meeting between Villalobos and Dreyfus. *Id.*

Villalobos and Dreyfus met on August 28, 2022, to discuss a potential resolution. *Id.* ¶ 53.

Villalobos states, "[a]lthough we were unsuccessful in resolving the dispute at that meeting, I understood that Mr. Dreyfus was willing to continue discussions and that he would send me a proposed coexistence agreement a few days after the meeting." *Id*. Villalobos did not hear back from Dreyfus, and Villalobos retained his present lawyers to serve as his litigation counsel. *Id*. ¶ 54.

Villalobos's litigation counsel sent a letter to Dreyfus on September 28, 2022, following up on the August 28, 2022 meeting. *Id*. ¶ 55. Defendants responded on October 5 and 7, 2022, providing a settlement proposal. *Id*. Villalobos states he rejected the coexistence proposal because "it provided no relief from the confusion their name was already generating in the market." *Id*.

Villalobos and Dreyfus met again on October 28, 2022, and following the meeting they exchanged text messages to discuss settlement. *Id*. ¶ 56. Villalobos states that during this time period, defense counsel asked his counsel to delay filing a lawsuit in order to see if a settlement could be reached. *Id*. Defendants provided another settlement offer in early November, which Villalobos rejected for the same reasons as the earlier proposal. *Id*. ¶ 57. Villalobos and Dreyfus continued their settlement discussions into December, with Villalobos delaying filing a lawsuit in the hopes of reaching a settlement. *Id*. ¶¶ 58-60. When settlement negotiations proved fruitless, Villalobos instructed his counsel to file this lawsuit. *Id*. ¶ 60. This lawsuit was filed on December 16, 2022, and the motion for a preliminary injunction was filed shortly thereafter.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 65 and the Lanham Act, 15 U.S.C. § 1116(a), a court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under section 1125(a) of this title." 15 U.S.C. § 1116(a). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Courts have also applied an alternative "sliding scale" or "serious questions" test, requiring the plaintiff

raise "serious questions going to the merits" and show that "the balance of hardships tip[s] sharply in plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32, 1135 (9th Cir. 2011) (stating plaintiff must also show a "likelihood of irreparable injury and that the injunction is in the public interest"). The sliding scale approach allows courts to balance the factors, offering flexibility where, for example, the plaintiff makes a weaker showing of likelihood of success, but a strong showing of irreparable harm. *Id.* at 1131. Regardless of the approach, a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22; *see also Herb Reed Enterprises, LLC v. Florida Entertainment Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (plaintiff seeking preliminary injunction in trademark infringement case must show that irreparable harm is likely, not just possible).

A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted) (emphasis in original). However, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters.*, 736 F.3d at 1250 n.5 (internal citation omitted).

## DISCUSSION

### I. Likelihood of Success on the Merits

SocioMX alleges causes of action for registered federal trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; federal trademark infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); California common law trademark infringement; and unfair competition in violation of California Business and Professions Code § 17200 based upon the predicate Lanham Act violations.

To prove federal trademark infringement, SocioMX must show (1) priority of use of a valid, protectable trademark, and (2) the defendant's use of the mark is likely to cause confusion. *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007). SocioMX's California state law

trademark infringement claims "are subject to the same test." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008). A claim of false designation of origin under Section 43 of the Lanham Act also requires a showing of a "likelihood of confusion." *New W. Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical[:] is there a 'likelihood of confusion?'").

SocioMX primarily asserts a theory of "reverse confusion." The Ninth Circuit explains that "reverse confusion occurs when a person who knows only of the well-known junior user comes into contact with the lesser-known senior user, and because of the similarity of the marks, mistakenly thinks that the senior user is the same as or is affiliated with the junior user." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021). "This can occur when 'the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user[.]'" *Id.* (quoting 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. 2020) (citations and footnotes omitted)). "Affiliation with a popular well-known brand may seem beneficial, but reverse confusion carries consequences. Reverse confusion can foreclose the senior user from expanding into related fields and could place the senior company's goodwill in the hands of the junior user." *Ironhawk Techs.*, 2 F.4th at 1160. "[T]he result of reverse confusion 'is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.'" *Id.* (quoting *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)); *see also Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 445 (3d Cir. 2000) ("[T]he doctrine of reverse confusion is designed to prevent the calamitous situation [where] a larger, more powerful company usurp[s] the business identity of a smaller senior user.").

## A.    Priority Use of Valid Trademark

SocioMX's federal trademark registrations for "SOCIO MX" and "SOCIOMX" constitute "prima facie evidence of the validity of the mark[s], and the registrant's exclusive right to use the

United States District Court
Northern District of California

mark[s] in connection with the goods specified in the registration[s]." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014). When, as here, "proof of registration is uncontested, the ownership interest element of a trademark infringement claim is met." *Id.* It is also undisputed that the SOCIOMX marks were used years before the Socios.com marks.

### B.    Likelihood of Confusion

When assessing reverse confusion, the Court considers the following "*Sleekcraft*" factors:

> (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

*Ironhawk Techs.*, 2 F.4th at 1160; *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) *abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003); *see also Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 932-34 (9th Cir. 2017) (applying the *Sleekcraft* factors for a reverse confusion claim). "[T]his eight-factor test for likelihood of confusion is pliant . . . the foregoing list does not purport to be exhaustive, and non-listed variables may often be quite important." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). "Because the factors are 'fluid,' a 'plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them.'" *Pom Wonderful*, 775 F.3d at 1125 (quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005)).

### 1.    Relevant Consumer Market

Before addressing the *Sleekcraft* factors, the Court "must define the relevant consumer market because 'a court conducting a trademark analysis should focus its attention on the relevant consuming public.'" *Ironhawk Techs.*, 2 F.4th at 1160-61 (quoting *Rearden LLC v. Rearden Com., In*c., 683 F.3d 1190, 1214 (9th Cir. 2012)).

Socios.com argues that the relevant consumer market is Hispanic/Mexican-American soccer fans in the United States because "until the month Plaintiff first contacted Defendants about

United States District Court
Northern District of California

Socios.com, most of its marketing was in Spanish, and targeted to fans of Mexican soccer." Opp'n at 16. Defendants cite Villalobos's declarations in which he states that the "majority" of SocioMX's original customers were Spanish speakers and that SocioMX did not switch to an English website until July 2022, and defendants note that SocioMX currently broadcasts in Spanish, has a Spanish language talk show, has a Mexican sports commentator, uses predominantly Spanish in social media, and recently had a popup message on its website in Spanish. *See* Villalobos Mtn. Decl. ¶¶ 4, 27-28, Villalobos Jan. 11, 2023 Decl. ¶¶ 3, 8; Rose Decl. Ex. F (July 2022 SocioMX website in all Spanish); Ex. D (Jan. 2023 SocioMX website in English with Spanish popup); Ex. G (Jan. 2023 SocioMX Instagram page in all Spanish). Defendants argue that, in contrast, Socios.com's U.S. marketing is primarily in English and is directed more broadly to U.S. fans of multiple U.S. sports and teams, including mixed martial arts, football, basketball and hockey.

SocioMX does not dispute that it has historically targeted Hispanic/Mexican-American soccer fans and that most of the SocioMX community is Hispanic. However, SocioMX also asserts that it has been seeking to attract a broader base of customers and that it has done so by organizing games with MLS teams and adding European teams to its roster. SocioMX's current website can be viewed in English or Spanish. While Socios.com targets fans of multiple sports, there is no dispute that it targets U.S. soccer fans, of which Hispanic/Mexican-American soccer fans constitute a not insignificant portion. *See* Villalobos Decl. ¶ 4; Reply Villalobos Decl. ¶¶ 15-21.

The Court finds that while there are factual questions about the precise delineation of the relevant consumer market, at a minimum that market includes Hispanic/Mexican-American soccer fans in the United States. In addition, because "confusion on the part of potential customers may be relevant," the Court can consider the fact that SocioMX is seeking to expand its base of customers in the United States. *Ironhawk Techs.*, 2 F.4th at 1161 (finding genuine issue of fact about the relevant consuming public where the plaintiff company only had one active customer (U.S. Navy) but previously had one non-military customer and was actively marketing to potential commercial customers).

///

### 2.       Strength of Marks

"Because the question in reverse confusion cases is 'whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user' we evaluate the conceptual strength of [SocioMX's] mark and compare it to the commercial strength of [Socios.com's] mark." *Ironhawk Techs.*, 2 F.4th at 1162.

The conceptual strength of a mark is determined based on a classification as generic, descriptive, suggestive, or arbitrary (in order of increasing strength), while the commercial strength of the mark is evaluated based on "the marketplace recognition value of the mark." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) ("[A]dvertising expenditures can transform a suggestive mark into a strong mark.") (internal citations omitted); *see*, *e.g.*, 2 McCarthy on Trademarks and Unfair Competition § 11:80.

### a.       Conceptual Strength of SocioMX mark

Trademarks "are generally classified in one of five categories of increasing distinctiveness: (1) generic, (2), descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "Arbitrary" or "fanciful" marks are the strongest marks and therefore are accorded the greatest degree of trademark protection. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002). "Suggestive" marks are a third category of marks and they do not "describe the product's features, but suggest [] them." *Kendall-Jackson Winery, Ltd. V. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n. 8 (9th Cir. 1998). "Descriptive" marks are the fourth category of marks and they describe a characteristic of a product. *Id.* at 1047. These marks only receive trademark protection if they acquire sufficient "secondary meaning" to create a link between the mark and the product. *Id.* "Generic" marks are the last category of marks and they "describe the product in its entirety, and which are not entitled to trademark protection." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 632 (9th Cir. 2005).

The parties dispute whether the SOCIOMX mark is suggestive or descriptive. "The line between descriptive and suggestive marks is elusive, and '[w]hich category a mark belongs in is a question of fact.'" *Ironhawk Techs.*, 2 F.4th at 1162 (quoting *Zobmondo Entertainment, LLC v.*

*Falls Media, LLC.*, 602 F.3d 1108, 1113 (9th Cir. 2010)).  "Whether a mark suggests or describes the goods or services of the trademark holder depends, of course, upon what those goods or services are."  *Entrepreneur Media*, 279 F.3d at 1142 (finding "Entrepreneur" as applied to magazine, computer programs and manuals was descriptive because the word "describes both the subject matter and the intended audience of the magazine and programs").

Monterrey Group argues that its mark is suggestive because "Spanish speakers would understand [the SOCIOMX mark] to mean 'partner MX'" when they use "their imaginations to apply the mark to SocioMX's platform for fans of soccer in the United States."  Pl. Mot. at 18. Monterrey Group asserts that "nothing about SOCIOMX 'is tightly linked with' soccer fan engagement opportunities in the U.S" and that imagination is necessary to reach the conclusion that the SOCIOMX brand is for a program offering in-person and digital engagement opportunities to soccer fans in the U.S.  Pl. Reply at 2.  Monterrey Group also notes that many Spanish dictionaries define "socio" as "partner," "mate," "buddy," "associate," "member," or "fellow." *See e.g.*, "Socio," *collinsdictionary.com Dictionary*, Collins, https://www.collinsdictionary.com/dictionary/spanish-english/socio_1.[8]

Defendants argue that within the soccer context, a "socio" is recognized as referring to a fan who is also an owner, or member, of a soccer club, with voting rights of control.  Defendants assert, "SOCIOMX is literally descriptive because it refers both to a company that partners with Mexican soccer teams and to a class of individuals to whom Plaintiff's services are directed—those fans who want partner-level engagement with Mexican soccer."  Opp'n at 11.  Defendants also note that Monterrey Group has used "socios" on its website and in its communications in a generic way, such as stating "our followers/socios will answer" and "3 [] Million socios."  Rose Decl. Ex. I

The Ninth Circuit has generally applied the imagination test or the competitors' needs test to differentiate between suggestive and descriptive marks.  *Zobmondo*, 602 F.3d at 1115.  The

---

[8] SocioMX also states in its reply that it has filed a declaration of incontestability with the U.S. Patent and Trademark Office.  Pl's Reply at 3.  If SocioMX's registered marks have become incontestable through plaintiff's compliance with the applicable statutory requirements, SocioMX is entitled to a conclusive presumption that its registered trademarks are inherently distinctive.  *See* 15 U.S.C. § 1115(b).

imagination test asks whether "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced" and it is the Ninth Circuit's "'primary criterion' for evaluating distinctiveness." *Id.* (citations omitted).  The competitors' needs test "focuses on the extent to which a mark is actually needed by competitors to identify their goods or services." *Id.* at 1117 (citation omitted).  "If competitors have a great need to use a mark, the mark is probably descriptive; on the other hand, if 'the suggestion made by the mark is so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods or services[,] this tends to indicate that the mark is merely suggestive.'" *Id.* (citation omitted).

The Court is inclined to find that the SocioMX mark is suggestive because a consumer would have to create an association between SOCIOMX and a Hispanic American oriented soccer fan engagement and loyalty program.  However, because the record before the Court is not fully developed and the question is a factual one, the Court finds it is prudent to defer resolving this issue, particularly because the mark is a non-English word. *See generally* 4 McCarthy on Trademarks & Unfair Competition §§ 23:36-23:40 (discussing additional considerations when foreign words are used in marks).  Further, "[w]hether descriptive or suggestive, the important question in a reverse confusion case is 'whether the junior mark is so [commercially] strong as to overtake the senior mark." *Ironhawk Techs.*, 2 F.4th at 1162-63 (quoting *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 n.2 (9th Cir. 2000)).

b.   Commercial Strength of Socios.com marks

The Court must assess the commercial strength of Socios.com's mark and "ask whether it is able to swamp the reputation of [SocioMX's mark] with a much larger advertising campaign." *Id.* at 1163.  "[I]n a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002) (per curiam) (affirming summary judgment in favor of Petsmart but finding that strength of the mark factor weighed in favor of the plaintiff because "Petsmart's

United States District Court
Northern District of California

1  extensive advertising gives it the ability to overwhelm any public recognition and goodwill that

2  Cohn had developed in the mark.").

3      Here, the record shows that the Socios.com marks have been growing in commercial strength

4  since 2018, with an increasing recent focus on the United States.  Socios.com states that over the

5  past three years, it has spent more than $68 million promoting Socios.com in the United States, and

6  related to the MLS alone, $4.125 million was invested in promoting Socios.com before July 7, 2022

7  and a total of $8.5 million before December 21, 2022.  Dreyfus Decl. ¶ 22.  Socios.com partnered

8  with MLS and MLS teams in 2022 and advertised in the MLS stadiums and arenas of its MLS

9  partners through 2022, including during the 2022 MLS championship game, and Socios.com was

10  an official partner of the 2022 Soccer Champions Tour.  At the February 10, 2023 hearing, defense

11  counsel stated that Socios.com would continue to do what is has for the last several years – namely,

12  develop relationships with existing partners, including about plans to offer fan tokens; post on social

13  media, including about various soccer-related content; advertise on social media, and so forth.

14      The Court finds that defendants' marks are commercially stronger than plaintiff's, and that

15  as defendants continue to expand their presence in the United States, defendants are likely to

16  "swamp the reputation" of SocioMX with a larger advertising campaign.  This factor weighs in

17  favor of SocioMX.

18

19          **3.      Similarity of the Marks**

20      The Ninth Circuit has "developed certain detailed axioms to guide this comparison: first, the

21  marks must be considered in their entirety and as they appear in the marketplace; second, similarity

22  is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more

23  heavily than differences."  *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1206 (9th Cir. 2000)

24  (internal citations omitted).  "[T]he more similar the marks in terms of appearance, sound, and

25  meaning, the greater the likelihood of confusion."  *Brookfield Commc'ns*, 174 F.3d at1054.

26      The Court finds that this factor weighs strongly in favor of SocioMX.  As to appearance, the

27  marks share the word "socio," with plaintiff's mark adding "MX" and defendants' marks making

28

"socio" plural and adding .com.  A comparison of the parties' websites[9] shows that the appearance of "SOCIO" in the parties' marks is similar, with SocioMX and defendants both using "SOCIO" in slightly different font and no apparent capitalization.  The parties do use different logos, with SocioMX using a soccer ball surrounded by flames or wings and defendants using an "S" shield logo.  However, when "Socios.com" appears in the general press there is no logo, and the articles reporting on Socios.com submitted by both sides shows that those articles often reference "Socios" to refer to defendants.  *See e.g.*, Rennich Reply Decl. Ex. G-O; Dreyfus Opp'n Decl. Ex. A at 2 ("Malta-based Socios believes it can . . ."); Ex. E (""Lionel Messi signs $20m deal with crypto firm Socios to promote digital fan tokens – report"); *see also Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998) (in reverse confusion case, finding "Dreamwerks" and "DreamWorks" similar despite "quite distinctive" Dreamworks logo because, *inter alia*, "'DreamWorks' often appears in the general press and in Industry magazines without the logo, leaving only the slight difference in spelling.").

The fact that "Socios.com" is plural and has ".com" does not detract from the marks' similarity because these differences are minor and ".com" is ubiquitous.  *See Brookfield Commc'ns*, 174 F.3d at 1055 ("Because many companies use domain names comprised of ".com" as the top-level domain with their corporate name or trademark as the second-level domain . .  the addition of '.com' is of diminished importance in distinguishing the mark."); *Dreamwerks Prod. Grp.*, 142 F.3d at 1131 ("While we recognize that spelling matters, we're not sure substituting one vowel for another and capitalizing a middle consonant dispels the similarity between the marks.").  SocioMX has also submitted evidence showing that defendants use "SociosUSA" and "Socios US" in social media, such as defendants' "Socios US" Twitter handle,[10] as well as other country-specific iterations such as "Socios Brasil," "Socios España," and "Socios Italia."  Rennich Reply Decl. Ex. C-F.  A

---

[9] The Court visited the parties' websites, https://socio.mx and https://usa.socios.com, on multiple days in March 2023.

[10] Plaintiff's reply brief states that after this lawsuit was filed, Socios modified its Twitter page to add ".com" at the top, although it still references "US" and "USA" and does not include ".com" in its SociosUSA Twitter handle.  Reply at 4-5 (contrasting photos of Twitter page before and after lawsuit); Rennich Reply Decl. Ex. F.

reasonable consumer could easily believe that "SocioMX" is an "ancillary division" of Socios.com. *See Dreamwerks Prod. Grp.*, 142 F.3d at 1131 (finding "a perceptive consumer who does notice the 'e' and lower-case 'w' in Dreamwerks might shrug off the difference as an intentional modification identifying an ancillary division [DreamWorks]"). For similar reasons, the Court finds that the sound of the marks is almost identical.

Further, the meaning of the marks appears to be very similar, if not identical. The SOCIOMX trademarks state that the English translation of "socio" is "partner," and SocioMX's website refers to the soccer fans who use its platform as "dedicated socios." Socios.com's Dreyfus states that he chose the "socios" name because he was inspired by the fan-controlled frameworks of many soccer teams around the world in which fans participate with voting rights in club management, and that "Socios.com represents the digitisation of voting rights, through the so-called Fan Tokens we issue for our partners, to reflect the traditional 'socios' partner model between fans and the soccer clubs they are members of." Dreyfus Decl. ¶ 4 (Dkt. No. 44). Thus, the parties both use "socio" or "socios" to mean sports fan partners.

### 4.      Proximity or Relatedness of the Parties' Goods and Services

"Goods and services are related when they are complementary, sold to the same class of purchasers, or similar in use or function." *Ironhawk Techs.*, 2 F.4th at 1163. SocioMX "need not establish that the parties are direct competitors to satisfy the proximity or relatedness factor." *Rearden*, 683 F.3d at 1212. "Related goods (or services) are those 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" *Id*. (quoting *Sleekcraft*, 599 F.2d at 348 n.10). The Ninth Circuit has "adopted a rather flexible approach to the whole notion of competition." *Id.*

> For instance, this Court concluded that two entities "are not properly characterized as non-competitors" where "both companies offer products and services related to the entertainment industry generally, and their principal lines of business both relate to movies specifically and are not as different as guns and toys or computer circuit boards and the Rocky Horror Picture Show."

*Id*. (quoting *Brookfield*, 174 F.3d at 1056).

Under this "flexible approach," this factor strongly weighs in favor of SocioMX because the

25

parties' goods and services are at the very least complementary. SocioMX organizes, promotes and sells tickets to soccer matches and tours featuring professional soccer clubs, while Socios.com has sponsored professional soccer matches and tours. SocioMX and Socios.com both seek to connect soccer fans with soccer teams by providing fan engagement opportunities. SocioMX does so by organizing soccer games, at which it sells merchandise, arranging "VIP" experiences such as locker room tours or the ability to conduct the coin toss, organizing meet-and-greet events and autograph signings with players, and producing digital content for SocioTV, its website and social media. Socios.com promotes fan engagement through its website and app where fans can participate in trivia and other games on their phones, voting on polls that impact team decisions, and owning Fan Tokens. The Socios.com website currently advertises "Introducing SOCIOS.COM US" and that "[t]he fan-first app is now available in the App Store & Google Play! Fans around the United States can engage with their favorite teams and earn rewards – tickets, behind-the-scenes access, VIP experiences, and more," including rewards such as "meet and greet with your heroes" and "signed merchandise." The buying public would reasonably believe that the products and services offered by SocioMX and Socios.com "to come from the same source if sold under the same mark." *Ironhawk Techs.*, 2 F.4th at 1163.

The Court recognizes that there are some differences in the goods and services offered by SocioMX and Socios.com, most significantly that Socios.com offers an app that facilitates digital engagement of sports fans through Fan Tokens or in-app currency, while SocioMX does not have an app and does not sell Fan Tokens. However, both parties provide soccer fans with a variety of fan engagement activities, including "VIP experiences" such as meet-and-greet events, and both sell or distribute soccer-related merchandise. Defendants also emphasize that they do not sell tickets to matches, organize matches, or engage in any broadcasting activity. However, the buying public could reasonably believe that Socios.com is somehow involved in organizing soccer matches and tours given Socios.com's partnerships with soccer teams and sponsorships of soccer tours, advertising in MLS stadiums – including the same stadiums where SocioMX has organized games – and articles advertising soccer games "presented" by Socios.com in 2022. *See, e.g.*, Rennich Reply Decl. Ex. S.

### 5.      Evidence of Actual Confusion

The next *Sleekcraft* factor is evidence of actual confusion, which is evidence "that use of the two marks has already led to confusion" among consumers.  *Sleekcraft*, 599 F.2d at 352.  "Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely."  *Id.*

SocioMX has submitted some evidence of actual confusion – the three corporate contacts who emailed Villalobos in August and September of 2022 after seeing advertising announcing Socios.com' MLS partnerships and sponsorships.  *See* Villalobos Decl. ¶¶ 36-39;  Lopez Decl. ¶¶ 7-8 (Director of Retail Sales at Pepsi Beverages North America, in August 2022 saw picture of press conference regarding match sponsored by Socios.com on Instagram) (Dkt. No. 55-18); Rodriguez Decl. ¶ 3 (former president of Liga MX team, in September 2022 saw advertisement of soccer match on social media) (Dkt. No. 55-19); Jaramillo Decl. ¶ 6 (Strategy Manager in Consumer Marketing at Capital One, in August 2022 saw advertising of two soccer matches) (Dkt. No. 55-20).  Each of those individuals contacted Mr. Villalobos after seeing the ads believing that the advertised matches were connected to SocioMX.  And the individuals expressed the view that fans would be confused because of the similarity between the names and because SocioMX and Socios.com both cater to soccer fans.  Lopez Decl. ¶ 11 ("In my opinion, this created confusion and can potentially limit me from continuing to partner with SocioMX on future games or events because I would not want customers or consumers to be confused with the advertised experience."); Rodriguez Decl. ¶ 6 ("At that time [September 2022], I had not yet heard of Socios.com.  I told Mr. Villalobos that the similarity between the two names was confusing and that fans would be confused as well.").

Defendants dismiss this evidence as *de minimis* and argue that SocioMX has not shown that any confusion actually affected a purchasing decision.  They also note that these instances of alleged confusion represent forward confusion, not reverse confusion.  Socios.com has also submitted declarations from two of its employees who were involved in negotiating Socios.com's soccer partnership and sponsorship deals who state that during those negotiations and communications, no one ever mentioned SocioMX and no one ever expressed any confusion about Socios.com versus

SocioMX.  *See* Rabinovitch Decl. ¶¶ 2-4 (Dkt. No. 46); Groen Decl. ¶ 15 (Dkt. No. 45).  In addition, Socios.com has submitted declarations from management employees at several sports teams who have partnered with Socios.com:  (1) Murray Kohl of Kraft Sports and Entertainment LLC, an affiliate of the New England Patriots and MLS team New England Revolution, both of whom are Socios.com's partners (Dkt. No. 48); (2) Santiago Montes of Chivas, a professional sports team in Mexico that is part of Liga MX (Dkt. No. 49); and (3) James Parker of Banner Seventeen LLC d/b/a/ the Boston Celtics.  Kohl and Parker both state that prior to entering into partnerships with Socios.com they conducted significant due diligence and that they never encountered any information about SocioMX during those efforts.  Kohl Decl. ¶¶ 5-6; Parker Decl. ¶¶ 5-6.  Montes similarly states that Chivas engaged in significant due diligence before Chivas announced its partnership with Socios.com in June 2022, and that he was unaware of SocioMX until August 2022. Montes Decl. ¶¶ 4-8.[11]  Socios.com has also submitted a letter from an employee of European soccer team Inter Milan, a team that has worked with both SocioMX and Socios.com, who states that he was not confused about the parties and is not aware of any fan confusion.  Dreyfuss Decl. Ex. J.

The Court finds that SocioMX's evidence of actual confusion is probative because "[i]f a professional, such as a commercial buyer, is confused, it is proof of the likely confusion of consumers, who are less likely to detect differences in marks."  4 McCarthy on Trademarks and Unfair Competition § 23:100; *cf. Rearden LLC*, 683 F.3d at 1218 ("[T]he confusion of presumably knowledgeable and experienced trade journalists and trade show organizers could very well influence the purchasing decisions of consumers."); *see also Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137 (11th Cir. 2022).  In addition, the Villalobos and corporate declarations indicate that entities that have worked with SocioMX in the past are now wary of engaging in future partnerships due to the potential confusion of soccer fans.  In contrast, the evidence of non-confusion (or non-awareness) submitted by Socios.com is not particularly probative because "[e]vidence of non-

---

[11]  In his reply declaration, Mr. Villalobos states that Chivas played in the first SocioMX tour in 2014 and that he has maintained a relationship with the team since then by making proposals to various Chivas executives in 2016, 2017 and 2018.  Reply Villalobos Decl. ¶ 14.  Thus, the record before the Court is unclear as to the relationship between SocioMX and Chivas and the extent to which Mr. Montes speaks for Chivas as opposed to solely on his own behalf.

confusion of professionals will have little relevance to the issue of confusion for products sold to consumers as well." 4 <u>McCarthy on Trademarks and Unfair Competition</u> § 23:100.

The parties have also submitted competing and conflicting surveys about the likelihood of confusion. SocioMX's expert, Sarah Butler, conducted a "*Squirt*" survey[12] where respondents were first shown a Socios.com promotional video and then were asked to identify if any of a series of webpages, one of which was SocioMX's, was for the company shown in the video. *See generally* Butler Decl. (Dkt. No. 12-48). Butler's survey showed 24.7% confusion between the parties' brands.

Defendants' experts conducted two surveys, which they refer to as "*Eveready*" surveys.[13] One expert, Dr. Swain, exposed respondents to the SocioMX website or Instagram page, or a control, and asked open-ended questions about source, affiliation, and endorsement. *See generally* Swain Decl. (Dkt. No. 51). For example, some respondents were shown SocioMX's website and then asked "What company or brand do you think offers the soccer matches and fan engagement opportunities shown on the webpage you just viewed?" and "Do you think the company whose website you just viewed has a business affiliation or connection with another company or companies?" *Id.* Dr. Swain's survey results showed "a net of 0.02% confusion." Def. Opp. Mot. 21. A second expert, Dr. Simonson, conducted an *Eveready* survey where respondents were first exposed to a wide array of material that included the U.S. version of the Socios.com website" and

---

[12] The two main survey formats for testing likelihood of confusion are the *Squirt* format and the *Eveready* format. 6 <u>McCarthy on Trademarks and Unfair Competition</u> § 32:173. The *Squirt* survey format shows survey respondents both the trademark owner's and alleged infringer's marks and products. *See Squirtco v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980); 6 <u>McCarthy on Trademarks and Unfair Competition</u> § 32:174.50. Respondents are then asked whether the products come from the same or different companies. *Id.* § 32:174.50. The *Squirt* survey format is usually used when consumers encounter the marks together in the marketplace. *Id.*

[13] "Unlike the '*Squirt*' format, the '*Eveready*' survey format does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience." 6 <u>McCarthy on Trademarks and Unfair Competition</u> § 32:174; *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 387 (7th Cir. 1976). In a reverse confusion case, the respondents, who are potential customers of the plaintiff's products, are shown the accused mark and asked open-ended questions about the source of the accused mark. 6 <u>McCarthy on Trademarks and Unfair Competition</u> § 32:174; *see Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994). The Court notes that Dr. Swain's survey showed respondents the SocioMX mark, not the Socios.com mark.

29

then asked "similarly neutral questions."  Dr. Simonson's survey found a maximum net of 0.3% confusion.

Each side criticizes the opposing party's expert surveys.  Defendants contend that the Butler *Squirt* design is inappropriate to use in this case because, *inter alia*, the parties' marks are not used in close proximity to each other and respondents were primed to be confused due to the exposure to both parties' marks.  SocioMX counters that defendants' *Eveready* surveys are inappropriate because it "assumes that Socios.com is widely recognized in the U.S., that its saturation of the market is already complete (it is not), and that the marks at issue in this case are not used on proximally competitive goods and services (they are)."  Pl. Reply at 9.  The Ninth Circuit has not decided whether the *Eveready* or *Squirt* survey formats are more appropriate to use to test for likelihood of confusion in reverse confusion cases but has held broadly that any type of survey evidence should be admitted "as long as [it is] conducted according to accepted principles and [is] relevant."  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (quotations and citation omitted) (reversing exclusion of *Squirt* survey).

The Court finds that the survey evidence is equivocal and that on this preliminary factual record, the Court cannot determine which survey is more probative of the likelihood of confusion. Here, the record does suggest that Socios.com has only recently moved into the area of U.S. soccer and that it is not yet widely known in this country.  The marks are used on some proximally competitive goods and services, such as advertising in the same stadiums and arenas and on social media, and there are some differences as well, namely that Socios.com has an app and SocioMX does not, and Socios.com is targeting a broader audience of sports fans while SocioMX has historically targeted Hispanic U.S. soccer fans.  Because both sides may have raised some valid criticisms of the opposing party's expert surveys, and because this case is at a preliminary stage, the Court defers resolving the issue of how to weigh the competing survey evidence.  *Cf. Wreal*, 38 F.4th at 140 ("But given that we conclude that the instances of actual confusion present in the record are sufficient to push this factor in Wreal's favor, we conclude that it is unnecessary to also address the issue of survey evidence especially as a plaintiff need not present survey evidence in a trademark claim in order to escape summary judgment.").

On balance, this element somewhat favors SocioMX because it has submitted evidence of actual confusion of three corporate employees who have worked with SocioMX in the past and who have partnered with SocioMX in targeting U.S. Hispanic soccer players, and who have expressed confusion on behalf of themselves as well as the opinions that soccer fans would be confused.

### 6.    Marketing Channels

Next the Court considers the parties' marketing channels.  "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products."  *Pom Wonderful*, 775 F.3d at 1130.  "Marketing channels can converge even when different submarkets are involved so long as 'the general class of . . . purchasers exposed to the products overlap.'"  *Id.* (quoting *Sleekcraft*, 599 F.2d at 353).

The Court finds this factor is equivocal.  Both parties target soccer fans in the U.S. (though SocioMX has historically focused on Hispanic soccer fans); both parties advertise during soccer games in some of the same arenas and stadiums, and on social media.  There are some differences – SocioMX has SocioTV, which is available on Roku, FireTV, and AppleTV, and Socios.com does not have an equivalent marketing channel; Socios.com has an app that is available through the Google and Apple app stores, and SocioMX does not have an app.  Thus, there is some overlap in marketing channels, particularly advertising in stadiums and on social media.

### 7.    Degree of Care Exercised by Purchasers

"In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines."  *Surfvivor Media, Inc.*, 406 F.3d at 634.  In analyzing this factor, courts consider the price, type of good, and level of sophistication of the consumer.  *Ironhawk Techs.*, 2 F.4th at 1167.  In addition, "[w]hen two companies have almost identical names, even the most experienced person in that line of business may be likely to be confused."  4 McCarthy on Trademarks and Unfair Competition § 23:103.

Here, the cost of a SocioMX game is approximately $50.  Socios.com currently offers Fan

United States District Court
Northern District of California

Tokens for free in the United States, although it hopes to offer these tokens for sale through cryptocurrency in the future.  The parties cite competing district court cases for the proposition that consumers spending $50 exercise a low degree of care, *see Maxim Integ. Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035 (N.D. Cal. 2009) (computer products), or a high degree of care, *Boost Beauty, LLC v. Woo Signatures, LLC*, Case No. 2:18-cv-02960-CAS-Ex, 2022 WL 409957, at *11 (C.D. Cal. Feb. 7, 2022) (cosmetic products applied to "sensitive portion of the body").  Although defendants emphasize that there is a multi-step process to set up an account on the Socios.com app, the fact that the Fan Tokens are currently free would suggest that fans may not exercise a significant degree of care.  Further, in buying tickets to a sports event, whether a $50 game organized by SocioMX or a professional MLS game sponsored by Socios.com, a sports fan is likely to be more discriminating about choosing a game based on the team playing rather than the organizer/sponsor. The Court finds that this favor weighs somewhat in favor of SocioMX, particularly given the similarity in the parties' names.

### 8.      Defendant's Intent

"[W]hen a court applies *Sleekcraft* in a case that presents reverse confusion, and the intent factor is relevant, it may consider several indicia of intent. . . . Intent could also be shown by evidence that, for example, the defendant knew of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion." *Marketquest Group*, 862 F.3d at 934. "[T]he importance of intent and evidence presented will vary case by case." *Id*. at 935.

At the hearing, defense counsel confirmed that defendants did not conduct a U.S. trademark search in 2018 or 2019 when Dreyfus chose the "Socios.com" name in Europe.  Although the Court does not give this factor significant weight, it does weigh in SocioMX's favor because at a minimum, defendants were careless by not conducting a trademark search when launching Socios.com in the U.S. *Cf. Survivor Media, Inc.*, 406 F.3d at 634 ("Absence of malice is no defense to trademark infringement.  Further, where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark, resolution of this factor favors [plaintiff].")

United States District Court
Northern District of California

1    (cleaned up, internal citation omitted).

2

3              **9.      Likelihood of Expansion of Product Lines**

4          SocioMX has submitted evidence showing that it has been expanding its business over the

5    past five years, organizing more games with MLS and European soccer teams, hosting games

6    outside of California and Texas, launching SocioTV, and expanding its digital presence with a new

7    website and on social media.  Villalobos also states that while he does not want to expand into

8    cryptocurrency, he is interested in developing and offering non-fungible tokens ("NFTs") and

9    expanding SocioMX's digital offerings.  Reply Villalobos Decl. ¶¶ 27-29, 38 & n.4.[14]

10         Socios.com also indicates that it plans to expand its growth in the United States and globally,

11   and that once it navigates the regulatory landscape with regard to cryptocurrency, plans to offer

12   cryptocurrency-based Fan Tokens for its U.S. sports partners.

13         The Court finds that this factor weighs in favor of SocioMX, as both parties are expanding

14   their digital presence and offerings to U.S. soccer fans.

15

16           **C.      Overall Analysis of *Sleekcraft* Factors**

17         The *Sleekcraft* factors favor SocioMX, and thus the Court finds that there is a likelihood of

18   confusion.

19

20   **II.    Irreparable Harm**

21         Pursuant to 15 U.S.C. § 1116(a), because SocioMX has demonstrated a likelihood of success

22   on the merits, SocioMX is entitled to a rebuttable presumption of irreparable harm.  Defendants

23   argue that SocioMX's claim of irreparable harm is belied by the fact that Socios.com has been

24   operating in the United States since 2019, and they assert that SocioMX has delayed "for more than

25   three years" in challenging defendants' marks.

26

27         [14] Villalobos also states that he wants to expand into U.S. football partnerships, but the Court

28   does not consider those possible ventures in the context of the requested relief, which focuses on soccer.

The Court disagrees.  Although defendants emphasize that the Socios.com website and app have been available in the United States since 2019, it is undisputed that defendants did not start to partner with MLS teams until May 4, 2022.  Jan. 5, 2023 Dreyfus Decl., Ex. A (Dkt. No. 30-2).   In 2018 and 2019, Socios.com partnered with European soccer teams.  Dreyfus Decl. ¶ 6.  Thus, while Socios.com had some presence in the United States in 2019 by virtue of its website and app, that presence was limited and focused on European sports teams.  According to Dreyfus's declarations, Socios.com began partnering with Americans sports teams and leagues in 2020 with two Mixed Martial Arts leagues (May and October 2020), and in 2021 entered partnerships with American football, basketball and other non-soccer teams.   This evidence, coupled with Villalobos's declarations, shows that Socios.com has gradually entered the United States sports market.

Villalobos states in his various declarations that as soon as he became aware of Socios.com's presence in the United States, he retained counsel in March 2022 who sent cease-and-desist letters to social media companies in April 2022.  While defendants criticize Villalobos for "delaying" in 2022, the Court finds Villalobos's explanation for his timing reasonable.   Villalobos states, "[b]ecause SocioMX is a small company, with only four employees and a budget that is entirely devoted to developing our brand, I was very concerned about provoking litigation with the much-larger and well-resourced Defendants."  Villalobos Reply Decl. ¶ 45.  Thus, he focused initial efforts on protecting his brand on social media, and when those efforts proved unsuccessful – and when he learned of the MLS partnerships in May 2022 – he retained U.S. counsel to engage with Socios.com. The Court is also not persuaded that SocioMX delayed between May 2022 and December 2022 because during that time, SocioMX was attempting to resolve this dispute without resort to litigation.

As to harm, SocioMX has submitted evidence showing that as Socios.com has increasingly moved into the United States soccer market, SocioMX has experienced harm in the form of actual confusion on the part of corporate partners.  In addition, "[t]he Ninth Circuit has recognized that potential loss of goodwill or the loss of ability to control one's reputation may constitute irreparable harm for purposes of a preliminary injunction." *Greater Los Angeles Softball Ass'n v. Ryan*, Case No. CV 17-04404-JFW (PJWx), 2017 WL 8292779, at *8 (C.D. Cal. Sept. 21, 2017) (granting

preliminary injunction where parties offered competing softball tournaments under the same name). Villalobos states that he does not want SocioMX to be associated with Socios.com's cryptocurrency business model for a variety of reasons, including fan criticism, the volatility of cryptocurrency, and regulatory issues.

## III.    Balance of Equities

SocioMX argues that it has already lost business and goodwill because certain corporate partners who also do business with Socios.com have cut off communications with Mr. Villalobos and other corporate partners have expressed confusion and reluctance to continue working with SocioMX due to the similarity of the parties' brand names and likelihood of fan confusion. SocioMX asserts that these harms are not speculative because there is already evidence that it has happened, and that more harm will occur if Socios.com continues its expansion into the U.S. soccer market.

Defendants argue that the equities weigh overwhelmingly in their favor because Socios.com is a global brand that defendants have spent years and many millions of dollars to establish. Defendants argue that it is fundamental to Socios.com's success that it operates under one single name and brand worldwide, and that if an injunction were to issue defendants would be required to rebrand.  They also argue that there is an "asymmetry" between SocioMX's narrow scope of its business focused on U.S. soccer games and Socios.com's global, multi-sport focus.  They also assert that the harms to SocioMX are speculative, and they assert that there may be many reasons why corporate partners do not want to work with SocioMX, including that there may be less demand for SocioMX's "friendly" games with the growth of other inter-league matches and tours.

The Court finds that the balance of equities weighs in favor of plaintiff, particularly since the injunction is narrowly tailored to only enjoin defendants from using the "socio" name in connection with U.S. soccer.  In addition, defendants have stated that in the near term they do not plan to advertise in MLS stadiums this season and will not be a partner of the 2023 Soccer Champions Tour, thus lessening the impact of an injunction.  Further, as discussed in the Conclusion of this Order, the Court is prepared to set an aggressive pretrial schedule and can hold a trial in this

United States District Court
Northern District of California

1    case as early as October/November 2023.

2

3    **IV.    Public Interest**

4         "In the trademark context, courts often define the public interest as the right of the public

5    not to be deceived or confused."  *Maxim Integrated Prod., Inc. v. Quintana*, 654 F. Supp. 2d 1024,

6    1036 (N.D. Cal. 2009) (granting preliminary injunction in trademark case); *see also Playboy*

7    *Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982) ("In addition to the

8    harm caused the trademark owner, the consuming public is equally injured by an inadequate judicial

9    response to trademark infringement.").  The Court has found that there is a likelihood of confusion

10   between the parties' marks, and thus that the public interest weighs in favor of an injunction.

11

12                                         **CONCLUSION**

13   **I.    Preliminary Injunction**

14        For the reasons set forth above, the Court finds that SocioMX has demonstrated that it is

15   entitled to a preliminary injunction.  The Court GRANTS the following preliminary injunctive

16   relief:

17        IT IS HEREBY ORDERED that Defendants Socios Services US Inc. and Mediarex
     Enterprises Limited, and all those in active concert or participation with each of them
18   (including, but not limited to, each of their officers, directors, agents, servants,
     wholesalers,  distributors,  retailers,  employees,  representatives,  attorneys,
19   subsidiaries, related companies, successors, assigns, and contracting parties) be
     preliminarily enjoined and restrained from:
20
          1. any and all use of the SOCIOS, SOCIOS.COM, SOCIOS US, and SOCIOSUSA
21   Marks, or any other logo, device, design, or word mark that is a colorable imitation
     of, or is similar to, the SOCIOMX Marks (together, the "SOCIOS Marks"), in
22   connection with the advertising, distribution, marketing, offering for sale, or sale in
     the United States of any product or service relating to the sport of soccer;
23
          2. representing in any manner or by any method whatsoever, that goods, services or
24   other products related to the sport of soccer and branded with the SOCIOS Marks are
     sponsored, approved, authorized by or originate from SocioMX or otherwise taking
25   any action likely to cause confusion, mistake or deception as to the origin, approval,
     sponsorship or certification of such goods, products, or services.
26
          Notwithstanding the foregoing, nothing in this Order shall prohibit Defendants from
27   using the SOCIOS Marks to advertise, distribute, market, offer for sale, or sell goods
     or services unrelated to the sport of soccer. Moreover, nothing in this Order shall
28   prohibit Defendants from using the SOCIOS Marks to advertise, distribute, market,

United States District Court
Northern District of California

offer for sale, or sell goods or services relating to the sport of soccer outside the United States, provided that such activities are not targeted towards individuals in the United States.

IT IS FURTHER ORDERED that Defendants and all those in active concert or participation with Defendants (including, but not limited to, their officers, directors, agents, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns, and contracting parties) take affirmative steps to dispel such false impressions that heretofore have been created by their use of the SOCIOS Marks in the United States in connection with the sport of soccer, including, but not limited to, recalling or removing from any and all channels of distribution any and all advertising, marketing, or promotional material and the like, bearing or distributed under the SOCIOS Marks or any confusingly similar variations thereof related to the sport of soccer.

IT IS FURTHER ORDERED that defendants, within 30 days after service of this order with notice of entry thereof upon them, be required to file with the Court and serve upon SocioMX's attorneys a written report under oath setting forth in detail the manner in which defendants have complied with the above-mentioned ORDERS.

## II.      Bond

Monterrey Group shall post a $10,000 bond within 10 days from the date of this Order.

## III.     Initial Case Management Conference

In the interest of judicial efficiency and conservation of the parties' resources, the Court continued the initial case management conference to May 5, 2023 at 2:30 p.m. to follow the early settlement conference before Magistrate Judge Spero on April 27.  After the notice of continuance, defendants objected to express their concern that a delay in setting a pretrial schedule would be prejudicial to defendants in the event an injunction issued.  The Court informs the parties that it is prepared to set an aggressive pretrial schedule at the initial case management conference, and that the Court has availability for a trial as early as October 2023, as well as availability in November 2023 and beyond.

///

1    Defense counsel also stated that she was unavailable on May 5 due to a trial.  The Court

2    directs the parties to meet and confer to select a new date for the initial case management conference

3    between April 28 and May 10.  The Court will hold the conference by zoom and can specially set

4    the conference (it need not be on a Friday) and hold the conference late in the afternoon if necessary

5    to accommodate counsel's trial schedule.

6

7         **IT IS SO ORDERED**.

8

9    Dated:  March 27, 2023

         SUSAN ILLSTON
10        United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California